Case number 317-0203, May Azaji, an affiliate cross-appellant by David Andridge v. Hassan Assaf, an appellant cross-affiliate by Jeffrey Neffel. Mr. Neffel. Good morning, your honors. Opposing counsel, may it please the court, my name is Jeff Dupont-Maharin on behalf of Dr. Assaf, and with me is Counsel Teresa Sassala as my co-counsel today. I'd like to begin my argument by pointing out that the almighty messiah... Could you speak up a little bit? It's really our amplification, more for recording than anything. Thank you for pointing that out. It's the first time anybody's ever said that to me. I'm normally considered a bit boisterous. The Illinois Divestment Violence Act was created to protect people from being abused or otherwise mistreated in the manner that is described in the act. It was not intended to be used as a sword in litigation to create an unfair advantage in a child custody dispute. That was what we think this case is all about. Let me begin by backing up a little bit, and this is part of the record. Back in November of 2016, the mother tried to restrict the father's visitation privileges even further than what they were originally restricted in the temporary order. The father asked me to file a counter-petition asking that his visitation privileges be enlarged. After a contested hearing, Judge McNeill heard much of the same banter that we heard in January, and he enlarged the father's visitation privileges to be equal to that of the mother. He postponed the beginning of that one-week-on, one-week-off schedule until January of the following year to allow the children to become acclimated to the concept of the new visitation schedule. If you review the record in this case and look at simply the docket entries, you will see this is probably one of the most contentiously litigated cases in the history of Rock Island County. Back and forth pleadings from 2013 until the present. The essential theme, however, is pleadings initiated by mother responded to by father when she didn't get what she wanted. In this case, she did not get what she wanted in November of 2016, and not surprisingly, the first day that the one-week-on, one-week-off visitation occurred, there was an orchestrated event in our opinion that happened by an alienating parent to create a disturbance in the target parent's home that escalated to the point where the next morning the mother and her attorney landed the courthouse to get an ex-parte emergency order of protection. I just happened to be there, as I'm there most days. I saw them. I said, what's going on? Well, we're here to get an emergency order of protection, but Sam tried to smother his child with a pillow last night. That's in the verified petition. He put a pillow over the child's face and tried to smother him. Attached to the petition were text messages containing the same verbiage. I said, wait a minute. We have a pending divorce case. We shouldn't be hearing an order of protection. There's a one-judge, one-child rule in effect. Unfortunately, Judge McNeil was sitting in Whiteside County that day. Later on that day, my calendar was cleared, and we heard an impromptu hearing on whether there was a criminal case established by the allegations and the petition, wherein, amongst other things, the children were interviewed in chambers without counsel being allowed to participate. I don't know what they said. It was improper for that to occur, but it happened. Who was the judge? Judge Message, the newly appointed Judge Message. She had that hearing, and after that hearing, she issued an emergency order of protection, which contained certain provisions that modified the father's rights. Going into the facts of this case, which led to the filing of the emergency order of protection, which were further explored at the plenary hearing on January 19th, certain facts came before the court, and as a result of the rulings in this court, of the trial court, we've identified three issues for this appeal, which are kind of interlaced, so we'd like to argue them all at one time, for sake of brevity. First, whether the trial court erred as a matter of law in entering a plenary order of protection under the Act when it made a specific finding that the childhood issue in the petition did not suffer any injury, and that is found, I believe, in the record at pages 15 and 16. He specifically said, and I adopt that finding, as I think the term he used, that there was no physical injury, no psychological injury, no psychiatric injury proven to have occurred to this child. That was in large part based upon the mother's testimony, which you will see, wherein she admitted as a physician, she examined the child, did not find any physical injuries. She states she had emotional only. She sought no treatment for physical injuries. The child was taken to school, was not directed to see the school nurse. She did take the child to the emergency room for treatment for any physical injury because there was none. When asked if she had sought treatment for psychological injuries or the emotional injuries she had identified, she said she had not. She said there wasn't enough time. I pointed out that there's the emergency room, there's Robert Young, there's plenty of avenues available if this child is suffering emotionally for the child to get help or at least be diagnosed as having suffered an emotional or psychiatric injury. She said, well, it's my opinion. I'm a physician. Upon cross-examination, she agreed she wasn't qualified to render that opinion. Her training, background, and experience do not qualify her to render such an opinion. That is why Judge McNeil found, and I quote, He adopts the finding that there was not any injury whatsoever that was sustained by the child at issue. Now, the second issue for appeal is whether the penalty order was against the manifest way to the evidence when it is undisputed that the occurrence upon which the petition for the order of protection under the Act arose from the father's reasonable decision to discipline the child for disrespectful behavior in a manner which was objectively reasonable and consistent with the purposes of the parental imposed discipline to teach and direct a child. That is specifically carved out as an exception for the term abuse under the Act. Unfortunately, reasonable direction of a child contains no definition within the Act. And I'll get to that in a minute. Finally, the issue presented for appeal is it's interesting that Judge McNeil found that there was no abuse that had occurred. The child suffered no injury whatsoever in the form of physical, psychological, or psychiatric injuries. However, he substituted his own judgment for that of Dr. Assaf regarding the proportionality of the discipline used by Dr. Assaf in response to the disrespectful behavior of J.A. towards the father. And in so doing, he infringed upon his constitutionally protected right to privacy in governing his parent-child relationship. Now, that is tempered, of course, by excessive corporal punishment, which I'll get to in a minute, which is what the only Supreme Court says we need to look to in determining whether or not there was abuse in this case. Let me get to the facts. Can I stop you for a minute? Yes. You said that Judge McNeil's decision was against the manifest weight of the evidence, but in your brief, you asked us to look at this de novo. I'm sorry. At certain portions, we did ask that because we believe he committed an error of law, that it be de novo, but the issues as framed is what I was reading from. At a certain point later in the brief, we bring up a de novo review as it applied to that passage that we're referencing at that time. I think the de novo suggestion is on page 16 of your brief. It's the first page under issue one. But I'll look at it. Okay. Thank you. The brief was actually written by Mr. Sala. I'm here today to argue the facts primarily because I think the facts demonstrate that when you apply the law identified in our brief and in our reply brief, it is quite clear that the decision should be reversed. The facts. As I stated, this is the first day that one-week-on, one-week-off visitation was to occur. Mother, children, pushed by mother, weren't happy about this. The children, as testified to by the father, were very unhappy, expressed their frustration and dissatisfaction with the new visitation arrangement ordered by Judge McNeil. And after picking up the children, in order to initiate his week, the father understandably went to the CVS pharmacy to pick up the supplies, allowing the children to participate in the decision as to what supplies they needed for toiletries, et cetera, at the CVS pharmacy. At that trip were John and Joseph, the two older children. The child at issue is J.A. John, age 12 at that time. In the process of being at CVS, they had to have a discussion. John, who is overweight for his age, wanted protein powder. The dad, a physician, tried to discuss with him that protein powder wasn't appropriate for him, giving his weight problems. He suggested the alternative minerals or some sort of vitamin supplements as a different path to pursue. When the child became defiant and argumentative, he went to the pharmacist, the only player in this game who has no skin in the game. I'm sorry, the only witness that has no skin in the game. The only objective third party who identified the fact that when they interacted, parent and child, the child was disrespectful to the father, the child was argumentative to the father about this, that he agreed with the father in the presence of the child, that the protein powder was not appropriate for him to have. The other alternative suggested by Dr. Asop would be the more appropriate route to pursue. They left the pharmacist's table. From three hours over, he heard John continue with this argument, loud enough that he could overhear the conversation again three miles over in a busy CVS pharmacy store, yelling at his father he wants the protein powder. The testimony is a little bit in conflict, but one thing we do know is the child grasped the protein powder anyway. We know he had it in his hand. J.A. said it accidentally came into contact with the dad's shoulder area, which we find a little bit disingenuous given the fact he's 12. The dad's a grown adult man. It's probably impossible for that to have accidentally touched his shoulder if it was falling out of his hand. His hand would be down here, the shoulder's up here. Something to consider. The older child, 13, described the incident a little bit differently. Well, he pushed it into dad, but it wasn't that hard. But he did acknowledge what dad said and showed signs of the fact that it hurt when he did this act directed towards the father. The father, who the pharmacist did observe, was acting in a calm demeanor that evening. Despite the defiance of J.A., testified that he forcefully shoved the can into him so hard the pain level was an 8 out of 10. A reminder, he's a doctor. They're familiar with what these terms mean. An 8 out of 10 pain caused him to ask the child to understandably apologize. He didn't strike the child in the store, as some parents are prone to do. He didn't scream at the child in the store. The pharmacist would have told us about that. He only heard the child losing control of his temper, his voice, etc. Instead, he simply asked for an apology. I believe the record also is uncontested that he didn't even have to mean it. Just please give me an apology because that's what we do in society. Two minutes. Two minutes? Wow. When we take into consideration the uncontested facts of this case, what you have, in fact, is a father trying to exercise reasonable discipline of a child to teach this child to conform to societal norms. Nothing more, nothing less. The cases that we cited in this brief talk about teachers who exercise a lot more force against a child, as Quintus Mokai.  And they were found to have not committed abuse. And the finding of abuse directed against them was overturned on appeal. And it's important for us to consider the fact that BEST determined that some of the terms used in the Domestic Violence Act are ambiguous and we should look to other acts for guidance. In BEST, two adults were fighting about normal protection. The court looked to the Juvenile Court Act for a definition of abuse. Counsel makes much to do about the fact that we look to other acts for guidance, but the oldest Supreme Court says we should. And in applying the definition of abuse in the Juvenile Court Act, father quite clearly did not commit any abuse directed against his child. A finding of abuse is necessary and a finding of injury is a prerequisite to that finding of abuse. None of that occurred in this case. For that reason, we don't think the judge's decision to superimpose his idea of how to discipline the child is constitutional. He had no right to do that. You have a right to discipline your child with reasonable direction, and the father did that, and the decision should be reversed. Did you discuss the proportionality you brought that up? I did. I did discuss proportionality in issue number three of our brief. You still have time in oral argument, I think. I'm sorry. No? Yes. I was trying to sum up. Okay. We discussed it at length, how the judge substituted his opinion of what was right and wrong for the dads, and that's dads alone to do. Thank you, Judge. Thank you, Your Honors. Mr. Anditch. Thank you, Your Honor. Please support, counsel. My name is David Anditch, A-N-D-I-C-H. I'm appearing on behalf of Dr. May Yazagi, who is the appellee and cross-appellant. So, in effect, Your Honors, there's two appeals that are going on right now before this court. With respect to the initial appeal, Judge, Mr. Kneppel is right in the sense that we go a great length in our briefs to suggest to the court that it is not appropriate, and even more importantly, not necessary to go to the Illinois Juvenile Court Act or the Reporting Act, the Neglected Abuse Reporting Act. Counsel cites many of those cases to raise some equation, apparently, between corporal punishment and what would happen in a neglect abuse case on this type of an allegation versus the law under the Illinois Domestic Violence Act. It's Dr. Yazagi's position. It's our position, Your Honors. The only place this court needs to look is at the Illinois Domestic Violence Act. There are an amazing number of precise definitions in the definitions section of that act, including what constitutes abuse, what constitutes physical abuse, what constitutes harassment under the Domestic Violence Act, what constitutes intimidation of a dependent, and what constitutes interference with personal liberty. Those are the five definitions that are critical to deciding this case. Okay, so what was the abuse here? The abuse, Your Honor, was very clear. It was testified to by JA-12 and JA-13, the first being John, the second being Joseph, Your Honor. The abuse, which is barely mentioned, counsel in his brief refers to it as enforcement of a timeout. The abuse was taking JA off the couch, throwing him on the floor, taking him to the center of the room. He hid his head somewhere between two to four different times on the floor, including one time, which is testified by both children, Your Honor. He hits his head on the television set. It is substantial physical abuse, in our opinion. It's never mentioned what happened here. All they say is Dr. Assange enforced the timeout. Well, that's the truth of what really happened was their concept of enforcement of the timeout is physically throwing this kid down on the floor, having him hit his head. And so did the kid go? You've got to understand, I'm thinking as I read this case, that my parents would have been in state bill. So what physical injuries did the child suffer? Your Honor, there's two answers to that question. The mother says that she didn't see any physical injury. But if you look at the record and the evidence in JA's testimony, he says his neck and had her for three days. That's his testimony, Judge. But I think there's a more important response, Your Honor. Your question assumes that a physical or a psychological or emotional injury is necessary for the court to enter an order of protection. That is absolutely incorrect. I understand. I got that. Okay. I just wanted to make sure that was clear, Your Honor. But I'm just wondering if, you know, were there any further timeouts after this episode or today? I'm just wondering if the next time you told the kid to get on the floor, the kid got on the floor of his own instead of having to be put there. Well, Judge, part of Judge McNeil's decision is there will no longer be timeouts on the floor. So there couldn't be. Or it would be a violation of Judge McNeil's order at the order of protection. He says timeouts should be taking the child's electronic apparatus, the equivalent. What will be substituted for that is sending the child to his room without his electronic equipment. That's what Judge McNeil says. So the answer to your question, no, there's no more timeouts because Judge McNeil said that was not appropriate. If that's your version, Dr. Asop, of what a timeout is, that there's going to be that level of physicality, that's not acceptable. In light of this order, if he tells this child to go to his room now and the kid's been thumbing his nose at his dad, he's saying I'm not going. You can't physically put me there. And the judge said when that hypothetical was raised by Mr. Mepple to Judge McNeil, Judge McNeil says, I think I'm quoting him, Justice Schmidt, he says, well, we'll have a problem, we'll be back here. That's what Judge McNeil said. Do you ever wonder whether the inmates have taken over the asylum? No. I mean, maybe I wondered my few free moments, Judge, but I understand the import of that question. And you're asking, I think, whether kids have taken over the concept of their own discipline and made discipline virtually impossible. Well, with the help of the courts. I'm not going to say yes to that, Judge. I mean, you write the decisions, you make the decisions, obviously, Judge. But I wanted to point out, I think there's a terrible injustice done to the record of this case in minimalizing the physicality that took place here, Judge. Read the testimony of those two children, which I think for a 12 and a 13-year-old is remarkable how smart they are and how articulate they are and how able they were to describe what their dad did to them. And I think that... Well, let's get, I mean, behind all of this. Are the judges or the courts now going to determine the continuum of physicality that is acceptable, that is not actionable? I mean, where do we go from here? In all seriousness, I mean, the answer the judge gave is not an answer. Well, we'll be back in court. When does this end? Well, the answer is, Judge, it doesn't end. It comes up, it's not going to. Never. It comes up in different contexts, and this court has to apply different laws to the context that the issue or the problem arises in. In this case, it was before the court under the Illinois Domestic Violence Act. You could have the exact same issue come up under the DCFS enforcement provisions, okay? Whether or not that was excessive punishment or inappropriate punishment by a parent can come up under that act. It also can come up in a charge against a parent under the Juvenile Court Act. So the answer is, Judge, there's no way that you're ever going to stop this because there will always be cases brought by the Department of Children and Family Services. If you look at their brief and read those cases, Judge, the vast majority are Department of Children and Family Services applying a totally different law from what is the law and the definitions under the Illinois Domestic Violence Act. And that's where we are. That's the law that in our opinion, Judge, justices must be applied in this case. With respect to this second real issue is... Okay, let's focus on that. I'm sorry. Because you're saying, okay, we're only focused on this act. Yes, we are. And so what specifically in the act is unambiguous that says this action taken by the father during parenting time is in violation of that act? There is nothing that says, not a single definition that says this act is a violation. But there's also not any other set of facts we could talk about today and you could create that is specifically addressed as a factual, this is a problem that occurred between a petitioner and a respondent in an Illinois Domestic Violence Act, whether they're a parent-child situation, husband-wife, boyfriend-girlfriend, or whatever, that never occurs, Judge, under the Illinois Domestic Violence Act. It has specific definitions that a trial judge has to apply to a specific set of facts. And that's the best the legislature could do. Alternatively, if you wanted a statute that was fact-specific to whatever a parent did to a child, what a girlfriend did to a boyfriend, or vice versa, whatever, that would be a pretty long statute. And if you look at the Illinois Domestic Violence Act, Judge, it's a pretty long act as it is right now. But it doesn't address any single factual scenario at all. So you can't say that because a father's discipline of a child isn't specifically referred to in the statute, you can't say that that means that there's no abuse. And Judge McGill very specifically says in his oral ruling, I am bound by the definitions, I'm applying the definitions to this evidence. Counsel has two minutes. Thank you very much. He did exactly what I believe any judge has to do in every situation that he or she is presented with under the Illinois Domestic Violence Act. If I could mention a couple more points, it's had two minutes, and I wanted to touch initially on my cross-appeal, our cross-appeal, excuse me. I wanted to say that it is well-accepted law by this court that its job is to reveal the correctness of a decision of a trial court judge. You don't necessarily involve or address whether the reason is right. And the reason I'm raising that point, Judge, is we respectfully submit to the court, you can take any of the four of the definitions that are set forth in the Illinois Domestic Violence Act, abuse, harassment, intimidation of a defendant, and interference with personal liberty, and any one of those sections and apply it to the trial evidence that was before Judge McGill and hold that that part of the Illinois Domestic Violence Act was violated, not just abuse, but it was also harassment and the other intimidation and interferences. So on that basis, it should be affirmed as well. If I could mention briefly the major thrust of our cross-appeal, and I'm sure I'll be back for five minutes more in a bit, our appeal is based on the fact that Judge McGill, while he was right most of the time, we believe he was absolutely incorrect in dismissing Dr. Yazagi's petition for lawyer protection. She was also a petitioner, not just for the protected person's children, but for herself. She alleged the claim of harassment under the Illinois Domestic Violence Act. The judge dismissed her claim, Dr. Yazagi's claim, at the end of her case, on a motion by counsel for a directed finding. As your honors well know, a motion for a directed finding, the standard that this court has to apply is accepting all the evidence and interpreting all the evidence, and like most favorable to the petitioner, is there evidence missing on any element of plaintiff's case, so the defendant doesn't have to go forward. There's no way you can read this record and believe that Dr. Yazagi's claim could be dismissed on a directed verdict. I submit to the court it's virtually impossible. There was a large quantum of evidence that supported her claim. Judge McGill only looks to, under the harassment issue, he only looks at three meetings that took place where the father showed up unexpectedly at two stores and in the surgeon's lounge at the hospital where he didn't even belong in the surgeon's lounge, but he shows up and meets her. That's all Judge McGill considered. He didn't consider and says nothing in his holding about the 12 to 24 times Dr. Assad showed up at a church to meet the children and Dr. Yazagi in the year before, in 2016. Now, there's a little problem with that. What's that? There's a question about that. That was a note. The trial judge said we're starting at November 20th, whatever, 2016, and now you're going behind that. Well, Judge, I'm going behind it because that's the second issue I raised in the boss appeal. I submit to the court respectfully. I do not understand Judge McGill's ruling cutting off or creating a window of evidence that he would hear from November 28th of 2016 to the date of the hearing on the plenary OP was January 17th, Judge. I actually counted those days for today's hearing. It's 54 days. I cannot imagine why, and I wasn't the trial judge, so it's not because I was there and I was sleeping. I wasn't, Judge. I mean, I was, I just, I've read the record very, very carefully. I find absolutely no explanation by the judge for how you could cut off for a plenary order of protection and limit the parties to 53 days. And that's the second ground that I claim this court has to reverse. Thank you very much. Thank you. Thank you, Your Honor. We begin by saying, I think with all due respect to a esteemed counsel, he's kind of missed the point. We're here about that portion of the Domestic Violence Act that talks about reasonable direction of a child, which is a carved-out exception for abuse. When an act doesn't clearly define what is reasonable direction of a child, the Illinois Supreme Court in the best says, when you have ambiguities, we can look to other similar statutes. In that case, two adults were fighting about a norm of protection, not involving children. The Illinois Supreme Court looked to the Juvenile Court Act for direction on how to interpret the term abuse. So to suggest it is improper for us to ask you to likewise look at the Illinois Domestic Violence Act or the rules regarding a DCFS hearing is, I think, it's not correct. We need to because we have no definition in the act. And in the Lyons case, which is almost squarely on point with this case, a teacher did exactly the same thing. Put a child to the ground, but instead caused actual physical injuries to the child. The appellate court found that to be permissible. Even though the child had suffered an injury, a physical injury, it was not excessive corporal punishment. And in this case, the act of guiding a child to the ground. Now, the children's testimony was conflicted. Dr. Witherspoon, Judge McNeely, announced his report finding evidence of alienation. The children testified inconsistently with each other about what happened. What's most important is that there is no evidence that showed that if you believe there was an injury, which mother said there wasn't, she's a physician, the court specifically found there wasn't an injury, that wasn't challenged on appeal. But even if you accept there was an injury, it was by accidental means only. And that exception is also recognized by the case law. So in the process of the child being defiant as a last resort, when the father asked her to apologize in the store, asked her to apologize when they were home, asked her to apologize again at home, and he wouldn't, the father then moved him to the ground. They say slammed him to the ground. That's not what the evidence said. That's not even what Joey said. That's what John wanted everybody to believe. But John's testimony is completely inconsistent throughout and was obviously the result of a coaching that occurred on the day the week-on-week-off was to start. And that's extremely important to consider when you consider the history of this litigation. When you talk about physicality, which is a question that we do raise, we look to these other cases. And the only time where we find physicality is excessive are those extreme cases where nobody in good conscience could say the discipline directed at the child was reasonable. We do have cases where a mother used a rod, in this case a spoon, which I cited in our brief, and caused actual, discernible, visible physical injuries to the child because she believed the rod was different than using a hand, which was meant for love. She repeatedly did this despite being admonished by DCFS, the police, and everyone. She was found to have committed domestic violence in the form of abuse. The case was overturned on appeal even though the child was physically harmed. The most we have in this case is a child saying his neck hurt a little bit because he wouldn't follow the father's first request, second, third, fourth request for a time-out. He was put to the ground, the form of discipline used forever for this child. Now, you ask the question, has the child ever acted up since then? It is uncontested that once he followed the time-out, he calmed down, he apologized again, father returned the cell phone to him, he didn't call his mom that night, he didn't text her until the following morning, and he texted nonstop until he got to school and went and told the principal who called him to DCFS. The record also shows that DCFS did thoroughly investigate this, by the way, after Judge McNeil made his finding and unfounded the report. That's important. They took way more time to investigate this, and even in the face of Judge Neal's ruling, they unfounded it. That's in the record. What's really important in this case is to consider the fact... They weren't investigating domestic violence, they were investigating an allegation under the Juvenile Court Act that the child had been abused. That's correct, and that's what BESS used as a reference point for abuse as well, because it's ambiguous. It's a little misleading to say that DCFS concluded this incident was unfounded because they're measuring it by different standards. Well, I'm suggesting that BESS suggested, since it's ambiguous in the statute, we should look to the definitions under the Juvenile Court Act and the rules followed by DCFS in determining whether excessive corporal punishment has occurred. And BESS did that, even with adults, and looked at the Juvenile Court Act. Can you give me an idea just what the hearing was like that day? Judge McNeil came from wherever? Whiteside. Whiteside County. He came down to Rock Island? That's correct. How long did the hearing take? Until 11 p.m. that night. What time did it start? I don't remember, but I believe it to be earlier in the day. 1 p.m. 1 p.m. It was exhaustive. It was, I believe, the latest case ever tried in Rock Island County. It was a five-and-a-half hour hearing. Five-and-a-half hour hearing? I believe it was. That was a temporary hearing. That was a temporary hearing. Yes, it lasted until 11 p.m. that night. Temporary. The plenary hearing. Yes, sir. Yes, sir, and that's what we're appealing is the plenary hearing. It lasted until 11 p.m. that night. We were there all day. Judge McNeil, is the judge assigned to handle the dissolution? Not any longer. Was he at that time? He was. Dr. Uzzese moved to recuse him for cause after the decision. Okay. So he's not anymore. That gives me a sense of, just gives me a sense. Okay. All right. So the bottom line here is Judge McNeil substituted his idea of what is or is not correct in front of the discipline, and the statute allows that to be made by a parent so long as they don't exceed what society determines or the state has determined to be acceptable, and that's where we look to guidance from these other acts about what is or is not excessive corporal punishment because corporal punishment, like it or not, is allowed in the state of Illinois. Sometimes, as you pointed out, it's necessary, and that's why I said to Judge McNeil, well, what do we do if he doesn't go to timeout? And he threw up his hands.  Thank you, Your Honor. Thank you. And, by the way, Mr. Andrews, I think you at the end of your last session, you were talking about your cross appeal at that point. I was, yes. So how much time have you got? Five minutes, I think. Make it four. Sure. Because you were talking about your cross appeal in your last. If that was improper, I apologize. It was, but you got four minutes. Well, okay, as long as I get my arguments before the court, I'm very happy. In addition to the point on reversing Judge McNeil's decision on a directed finding and throwing out Dr. Yazagi's petition for harassment and a order of protection, I was also talking earlier about this limitation to 54 days, that the whole hearing could not. The petition for the emergency order that your client filed. I don't know. Was there an emergency order she filed? No. She applied for a plenary order. That's correct. Did she allege in the petition the back date? Yes. Back in 2013, Your Honor, when the parties separated. So the petition itself. The petition alleged it from 2013, individual and specific acts of abuse and harassment. You spoke to the standard that we look at, viewing the evidence in the light most favorable to the petitioner. Yes. Is it possible for Judge McNeil to make credibility determinations at that stage? No. No, I think the law is just the opposite, that a judge is forbidden and prohibited to make the credibility determinations at that point. If there have to be credibility of witnesses issues decided by the court, it's my understanding you cannot grant a motion for a directed finding. The case has to go to its conclusion. That's my understanding of the law. Well, that's certainly the case in a jury trial, but in a bench action. Yes, I believe that is the law. I mean, I don't think there's Does that make any sense? Yes, I think it does, Judge. Both parties still have the right or could be called as witnesses in the defendant's case. There's plenty of evidence to go, Judge. Yes, I think it makes perfect sense. And I've never seen any opinion, Judge, that distinguishes between a bench and a jury trial on anything the court should do in granting or deciding a motion for a directed finding. The only final point I wanted to mention, Judge, and it's raised in my briefing covers, is I do think that Judge McGill also erred in the remedies that he provided on this order of protection. Some of them are certainly somewhat bothersome. The most is, I believe, I respectfully submit to the court, Judge McGill should have continued the supervised visitation part of this. If he found that abuse occurred, which he did, and therefore, under the shall word, he had no choice but to enter an order of protection, I can't understand the rationale for the judge to eliminate supervised visitation, which was the order from Judge Message. So the pending order at that time for visitation was... That order terminates. I'm sorry? That emergency order terminates after 14 days or 30 days. This was within the 14 days, Your Honor. This is nine days after... This is a fresh review by Judge McGill. He's not bound by what... I didn't submit. I'm not making my point clear. I didn't say that he was bound by it. I said what I believe he should have done. I believe he's wrong in having removed, or not ordered, any way you want to put it, I believe there should have been supervised visitation. When you find that a parent has abused a child, I don't know why you would allow visitation to go unsupervised. I think it is a surprising ruling. And two other parts of that, if you read the entire brief and the record, is that... I don't mean any disrespect. I just get involved in my... I get it. We all do. We appreciate your zeal. Can I get my pen? Sure. I don't want to overcomplicate. I don't want to overcompensate anybody. I'm sorry. Thank you very much. And do you have anything you want to say about the cross-appeal? Well, yes. Just take that section, please. Very briefly. There was an extended hearing to answer your question that occurred in November 2006, where much of the same evidence was already heard. And it was brought up again in January as well. And Judge McNeil didn't want to hear it again. What's interesting is they didn't raise that as an objection. The trial court has waived. It's done. It's over with. Second, Judge McNeil is not a jury. He's able to remember what happened before and assess the credibility of witnesses like you're talking about in that 56-day window because he had just heard 56 days prior all the other nonsense that the mother was alleging previously that he discounted. And, in fact, similar evidence enlarged father's visitation. I think he misunderstood what is reasonable direction of a child and did not consider what the case law says about that in the context of what the definition of abuse is because it's not defined within this Act. So we can't allow Judge McNeil to answer your question to do that because Judge McNeil is not a jury. Plus, I point out the legislative history that we set in our brief presents this precise question. It's really important for us to consider the fact that when this bill was enacted and we cite this in our brief extensively. You're going beyond. We're talking about the cross appeal. The cross appeal. You know, his argument in the cross appeal was the fact that it was misapplied. I was simply trying to address that. The legislative history talks about the difficulties in applying this Act. And we certainly don't want to have a child be prevented from going out on a curfew violation. And that's an interference with personal liberty. But anyway, with respect to the mother's questions about her harassment, it's really interesting. Look in the record. Talk about one of the incidents she alleges is harassment at the physician's lounge. She initiated the communication and laughed about it. I mean, he cracked chicken. And to suggest the father's incidental, coincidental contacts with the child out in the community as a form of harassment directed at her when she cited no harassment at all is disingenuous, especially when the Illinois Marriage and Dissolution Act directs us to promote a relationship between parent and children. Let me ask you a procedural point. If we do agree that the matter should be remanded for Judge McNeil to reach the merits of the second petition for order of protection, do we remand it to Judge McNeil? I don't know the answer to that question. I can make up one, but I don't know it. Okay? I'll just be candid with you. But I don't think we need to get there because she didn't have her election. Okay. Bye. Thank you, Judge. All right. Ms. Neville, Mr. Anditch, thank you both for your arguments here this morning. This matter will be taken under advisement that this petition will be issued right now and will be at a brief recess for a panel of people. Thank you.